**In re Margie Louise COX, Debtor.**

**Margie Louise COX, Plaintiff,**

v.

**UNION COUNTY BANK formerly City & County Bank of Union County, Defendant.**

**Tate E. CARTY, Trustee, Plaintiff,**

v.

**UNION COUNTY BANK formerly City & County Bank of Union County, Defendant.**

**Bankruptcy No. 3–84–01787. Adv. Nos. 3–85–0841, 3–85–0922.**

United States Bankruptcy Court, E.D. Tennessee.

Jan. 29, 1986.

Child, O'Connor & Petty, Charles H. Child, Knoxville, Tenn., for plaintiffs.

Lacy & Winchester, P.C., J. Michael Winchester, Knoxville, Tenn., for defendant.

CLIVE W. BARE, Bankruptcy Judge.

At issue in this chapter 13 case is the validity of a $27,500.70 "secured" claim filed by Union County Bank. The Bank contends the claim, based on a note signed only by the debtor's husband, is secured by real property owned solely by the debtor. Challenging the validity of the claim are both the debtor and the trustee.[1] Also at issue is whether the debtor is entitled to recover of the Bank the state statutory penalty for failure to release a deed of trust. Tenn.Code Ann. § 66–25–102 (1982).

**I**

Margie Cox, the debtor, filed her chapter 13 petition on November 13, 1984. Union County Bank has filed, and asserts, three claims based on the following notes:

1. The adversary proceedings filed by the objectors were consolidated pursuant to an order entered April 23, 1985.

| DATE OF NOTE | AMOUNT | NOTE # | MAKER(S) | SECURITY |
|---|---|---|---|---|
| May 25, 1976 [2] | $10,644.94 | 84,572 | Charlie and Margie Cox | 1.0-acre marital residence and adjoining 0.68-acre tract |
| Nov. 8, 1977 | $10,878.00 | 89,827 | Charlie and Margie Cox | 0.68-acre tract |
| May 21, 1983 | $26,116.27 | 39,081 | Charlie Cox | Disputed |
| June 18, 1983 | $9,452.50 | 39,345 | Charlie and Margie Cox | 1.0-acre marital residence |

On January 4, 1985, the court entered an order confirming the debtor's plan, providing in part that the Bank's secured claims shall be paid in full within fifteen (15) days of allowance. After filing an objection to allowance of the claim based on the May 21, 1983 note in the amount of $26,116.27, the debtor filed an adversary proceeding asserting the note was obtained through fraud. The debtor requests a determination that the claim based on her husband's note is unenforceable against her individual property. Additionally, the debtor requests damages, including her attorney fees and expenses in this proceeding, for the Bank's failure to release the May 25, 1976 deed of trust against her property. Tenn.Code Ann. § 66–25–102 (1982). The debtor's chapter 13 trustee has filed a separate adversary proceeding asserting that the Bank's payment, only thirty-nine (39) minutes prior to the filing of debtor's chapter 13 petition, of the recording privilege tax [3] on the indebtedness represented by the May 21, 1983 note is a fraudulent transfer, 11 U.S.C.A. § 548(a)(2) (1979 & Supp. 1985).

The disputed claim [4] is based upon the $26,116.27 promissory note, dated May 21, 1983, signed only by the debtor's husband, Charlie Cox.[5] The Bank contends that Charlie Cox's debt is secured by property belonging to the debtor individually by virtue of a future advance or dragnet clause, contained in deeds of trust executed by both Charlie and Margie Cox, reciting in part:

> But this conveyance is made IN TRUST to secure the full, prompt and final payment of any and all indebtedness, principal, interest, attorney's fee and costs, as may be provided in instruments evidencing such indebtedness, *now or hereafter owing,* directly or indirectly, or, as indorser or security for others, to City and County Bank of Union County, its successors and assigns, *by the undersigned, or either of them* .... [emphasis added]

This dragnet clause is included in three deeds of trust to the Bank, dated May 25, 1976, November 8, 1977, and June 18, 1983.

*The November 8, 1977 note*

As security for their $10,644.94 note of May 25, 1976, Margie and Charlie Cox executed their deed of trust encumbering two tracts owned solely by the debtor: a one-acre tract which is their marital residence and an adjoining, unimproved 0.68–acre tract. The May 25, 1976 note reflects on its face that the collateral for the note is for "personal use." The proceeds for this

---

2. The debtor contends this note is paid in full, but the Bank maintains it was renewed, not paid, by the November 8, 1977 note in the amount of $10,878.00.

3. See Tenn.Code Ann. § 67–4–409(b) (1983).

4. Debtor also disputes the Bank's calculations of her indebtedness represented by two other claims based on the notes dated November 8,

1977, and June 18, 1983. However, the parties expect to amicably resolve any dispute related to these two claims. Certain overcharges for filing fees shall be considered in resolving the amount of these claims.

5. Charlie Cox is not a party to the debtor's chapter 13 bankruptcy case or these adversary proceedings.

note went directly or indirectly toward rebuilding the debtor's residence, which had been destroyed by fire.

When payments on the May 25, 1976 note became delinquent in 1977, the Bank initiated foreclosure proceedings. Jack Edmondson, the debtor's brother-in-law, became aware of the foreclosure action through the published notice. On November 8, 1977, accompanied by the debtor, he went to the Bank's office where they met with Rudy Garren, executive vice-president of the Bank. Charlie Cox did not attend this meeting. Although there is some dispute about what transpired at this meeting, the court finds that the May 25, 1976 note was then and there paid in full. In response to Edmondson's inquiry Rudy Garren stated that Margie Cox owed $7,571.31 to the Bank. Thereupon, Edmondson wrote his personal check for that amount, drawn against his account with the Bank, payable to the Bank with the notation "Margie's House in full." The check was negotiated by the Bank and stamped "Paid." [6] Likewise, the May 25, 1976 note is stamped "Paid Nov 8 1977." Accordingly, the May 25, 1976 note was paid in full, not renewed as contended by the Bank.[7]

Also at the meeting on November 8, 1977, Edmondson requested that the Bank make no further loans to the debtor against her residence. Rudy Garren indicated his assent to Edmondson's request. At the same time, the debtor requested that Garren mail the released deed of trust to either her or Edmondson. Although Garren stated he would do so, as of the trial on September 16, 1985, the May 25, 1976 deed of trust still had not been released.

At or about the conclusion of this transaction, Rudy Garren suggested a way that Edmondson could have his money back: the Coxes would execute a new note, with affordable installment payments, secured by a deed of trust on the 0.68–acre unimproved lot. Apparently after some discussion this was agreed to by the debtor, who thereupon executed a new note in the amount of $10,878.00. At some later point in time Charlie Cox also signed the note and deed of trust.[8] The note reflects it is a "New" note, not a "Renewal" note.[9] A cashier's check was drawn in the amount of $7,571.31 payable to Charlie Cox and Margie Cox. The back of the check contains the endorsement of Charlie Cox, Margie Cox and Jack Edmondson in that order.[10] Charlie Cox denies, however, that he endorsed this check and testified at the trial that he had never seen the check.[11]

*The May 21, 1983 note*

Charlie Cox testified that he had borrowed from the Bank for business purposes since 1978, when he commenced purchasing, repairing, and reselling automobiles. According to Cox, he and Rudy Garren were in business together, equally sharing profits realized from the resale of automobiles. Cox testified that he wrote checks against his own account with the Bank to purchase automobiles; he notified Rudy Garren of the purchases and exe-

---

6. Although the Bank argues that Edmondson's checking account balance on November 8, 1977, was not sufficient to cover his check, his savings account at the Bank did contain sufficient funds. Further, Edmondson's checking account statement reflects a $7,571.31 deposit and corresponding debit on November 8, 1977. See note 10, *infra,* and accompanying text.

7. Both the debtor and Edmondson testified positively and unequivocally concerning their November 8, 1977 meeting with Rudy Garren, who, in contradistinction, essentially testified he could not recall anything about Edmondson's check. Rudy Garren did testify that Edmondson had a reputation for honesty and truthfulness, and that he could be believed under oath.

8. Rudy Garren's signature and seal appear on the notary acknowledgment for Mr. and Mrs. Cox, certifying that both appeared before him on November 8, 1977.

9. This fact further supports the court's finding that the May 25, 1976 note was paid in full.

10. The proceeds from the cashier's check were deposited in Edmondson's checking account at the Bank. See note 6, *supra.*

11. But during a discovery deposition Charlie Cox was equivocal as to whether he had endorsed the cashier's check. See Exh. 47, Discovery Deposition of Charlie Cox at 21–22.

cuted notes to the Bank in exchange for deposits to his account to cover his checks. Rudy Garren denies that he and Charlie Cox were ever in business together; he also denies sharing in any profits from Cox's business.

Charlie Cox and Rudy Garren also gave conflicting testimony about the $26,116.27 note, dated May 21, 1983, signed solely by Charlie Cox. According to Garren, this note, purportedly secured by nine motor vehicles, was completed based on information furnished by Charlie Cox and signed after completion at the Bank's offices. The note, reflecting it is a renewal of two other notes not proffered at trial, was due and payable on July 20, 1983. According to Cox, Rudy Garren brought a blank note to his place of business in October or November 1983, and told him that bank examiners were pressing for documentation of outstanding loans. Cox testified that he signed the blank note at Garren's insistence; further, that he owned only two of the nine motor vehicles described as collateral in the note when it was signed.[12] Cox insists he signed the note at his body shop on the back of a 1976 Oldsmobile Cutlass. Further, Cox testified that Garren demanded a deed of trust against a tract he and the debtor had purchased in June 1983 through a Union County Chancery Court sale. According to Cox he told Garren:

> I said, "Now, wait a minute. There ain't no need of me a'going and asking Margie [the debtor] for a deed on that property or any other property." I said, "That's out of the question." I said, "I told you at the start of this thing, that she has got nothing to do with it, and there's ain't no property a'go on it."[13]

Rudy Garren denies requesting any real estate security for the $26,116.27 note. He also denies that bank examiners demanded additional documentation relative to the loan.

Charlie Cox testified unequivocally during his discovery deposition that he never signed a $26,116.27 note to the Bank; that he never financed nine motor vehicles for $26,000.00; that he never got $26,000.00 from the Bank in return for his note; and that he never made any payment against the note. However, the Bank introduced a copy of a check, dated June 11, 1983, from Collins Auto Sales & Service payable to Charlie Cox in the amount of $4,800.00 for a 1980 Olds. The Bank's records reflect that Charlie Cox endorsed this check, deposited $600.00 to his checking account, received $1,200.00 cash, and paid $3,000.00 against the $26,116.27 note. Further, the note bears a handwritten notation "Release 6/13/83" just above the words "1980 OLDSMOBILE" in the security block of the Bank's note. The Bank's records further reflect an $800.00 payment on March 30, 1984, through a debit against Charlie Cox's checking account with the Bank.[14] Inexplicably and oddly,[15] however, there is no evidence the Bank demanded payment on the note, which matured July 20, 1983, prior to the summer of 1984.

### The June 18, 1983 note

Charlie and Margie Cox executed their note for $9,452.50 to the Bank on June 18, 1983. The Coxes obtained the loan for the purpose of paying the balance on unimproved real estate purchased, through a judicial sale, for a personal use. The Bank declined to accept the real estate which the Coxes jointly purchased as security for their $9,452.50 note, insisting instead that they mortgage the one-acre tract which is their marital residence. According to Charlie Cox, Rudy Garren reneged on his assurance that the Bank would accept the

---

12. According to Charlie Cox the other seven motor vehicles had been previously sold. Cox's records (Exh. 25) are too incomplete to substantiate this testimony.

13. See Exh. 47, Discovery Deposition of Charlie Cox at 27.

14. The Bank's commercial loan history card (Exh. 42) reflects a zero balance owing on the

$26,116.27 note. Presumably the April 2, 1984 "PRIN PMT" of $22,342.03 and "INT PMT" of $2,690.19 represent chargeoffs.

15. It appears the Bank charged off the debt before demanding payment from Charlie Cox. See note 14, *supra*.

property the Coxes proposed to, and did, purchase at the judicial sale after the Coxes successfully bid and made a $750.00 down payment.

## II

Payments were made against the November 8, 1977 note until the summer of 1984 [16] when the Bank declined to accept further payments unless the Coxes paid the $26,116.27 note executed by Charlie Cox. At the same time the Bank demanded that Charlie Cox pay a $167,000.00 obligation arising from his bid on a tract in Anderson County, Tennessee. Apparently this latter obligation arose when Charlie Cox, at the request of C.H. Butcher,[17] successfully bid at an auction sale on behalf of Blue Ridge Land and Development Company. According to Cox, at Mr. Butcher's instruction he wrote a $21,000.00 check against his own account at the Bank as a down payment. Charlie Cox testified that he never received his cancelled check and, further, that he never had $21,000.00 in his life at one time in the Bank.

On October 18, 1984, the Bank commenced foreclosure proceedings under the May 25, 1976 deed of trust against both the debtor's residence and the 0.68–acre adjoining lot. The debtor filed her chapter 13 petition on November 13, 1984, thereby stopping the Bank's scheduled foreclosure sale. 11 U.S.C.A. § 362(a) (1979 & Supp. 1985).

The Bank relies upon the dragnet clause in the deeds of trust from the Coxes dated November 8, 1977 and June 18, 1983 to establish that the disputed claim is secured by the debtor's individual property. Although the debtor contends the $26,116.27 note was fraudulently procured, she insists that in any event the Bank's disputed claim is not secured by her property because the $26,116.27 note, representing a business debt, is not of the same class of debt as her admitted (personal) debts secured by the 1977 and 1983 deeds of trust. See *Blurton v. Dyersburg Prod. Credit Ass'n,* 26 B.R. 508 (Bankr.W.D.Tenn.1983) (mortgage on debtors' residence did not secure deficiencies on prior loans pursuant to future advance clause because prior construction and business loans were not in same class as home loan). The Bank argues the "same class" rule has never been recognized by the Tennessee courts [18] and that the common law in Tennessee is codified by Tenn.Code Ann. § 47–50–112 (1984), which enacts in part:

*Contracts to be enforced as written.* —(a) All contracts, including, but not limited to, notes, security agreements, deeds of trust ... in writing and signed by the party to be bound ... shall be prima facie evidence that the contract contains the true intention of the parties, and shall be enforced as written; provided, however, nothing herein shall limit the right of any party to contest the agreement on the basis it was procured by fraud or limit the right of any party to assert any other rights or defense provided by common law or statutory law in regard to contracts.

(b) Any contract, security agreement, note, deed of trust or other security instrument, in writing and signed or endorsed by the party to be bound, that provides that the security interest granted therein also secures other provisions or future indebtedness, *regardless of the class of other indebtedness,* be it unsecured, commercial, credit card, or consumer indebtedness, shall be deemed to evidence the true intentions of the parties, and shall be enforced as written; provided, however, nothing herein shall limit the right of any party to contest the agreement on the basis that it was pro-

---

**16.** The Coxes' coupon book (Exh. 6) reflects that the payment the Bank declined to accept was due on July 15, 1984. The date on which payment was tendered and refused is uncertain.

**17.** It is unclear whether Cox meant C.H. Butcher, Sr. or C.H. Butcher, Jr. or C.H. Butcher, III,

all of whom have been closely connected with Union County Bank.

**18.** In support of its position the Bank cites *Odom v. Federal Deposit Ins. Corp.,* No. 84–45–II (Tenn.Ct.App. Oct. 2, 1984).

cured by fraud or limit the right of any party to assert any other rights or defense provided by common law or statutory law in regard to contracts. [emphasis added]

However, the debtor argues Tenn.Code Ann. § 47–50–112(b) (1984) is inapposite because its effective date was May 26, 1983, subsequent to the Coxes' primary obligation and the future advance represented by the note dated May 21, 1983.[19]

The court finds it unnecessary to resolve the conflicts in the testimony of Charlie Cox and Rudy Garren and decide whether the $26,116.27 note is enforceable.[20] Further, the court finds it is not necessary to resolve the competing legal arguments, including the trustee's contention that the Bank's payment of the recording privilege tax only thirty-nine (39) minutes prior to debtor's bankruptcy filing is a fraudulent transfer.[21]

The proof clearly establishes that the debtor did not participate in her husband's business operation except to occasionally tape an automobile in preparation for painting. She never wrote checks against Charlie Cox's account at the Bank[22]; she never reconciled his bank statements; she had no involvement whatsoever with the financial records of her husband's business. When asked during a discovery deposition if she even knew whether her husband had a bank account for his business, the debtor responded: "I know nothing about the business, nothing at all."[23] When asked at trial if she was aware of her husband's business dealings at the Bank, the debtor

testified: "I knew he went to the garage and worked, but I don't know what dealings he had or anything like that."[24]

The debtor further testified she was not aware she owed any obligation to the Bank other than the two notes dated November 8, 1977 and June 18, 1983. She did not know that her husband signed the May 21, 1983 note and is not aware of his receipt of any proceeds in consideration of the note. Although the debtor knew nothing about the May 21, 1983 note, she did know prior to June 1983, that the Bank asserted some claims against her husband. Her discovery deposition testimony establishes this:

A. I kept wondering why I hadn't got my deeds that were paid off. I kept wondering. That was a long time before we bought the other property [through the judicial sale in June 1983].

Q. Okay.

A. Rudy [Garren] told me the day I paid it off—I wanted my deeds that day—he said, "I'll mail them to you." And, when he didn't, I kept calling; I kept getting the brush off, the put off.

Finally, I got ahold of Pat [a Bank employee] one day, and she said, "Oh, you can't have your deeds." I said, "Why?" She said, "The open-end clause" or something; "Charlie owes us a lot of money."

I said, "Charlie might owe you, but I don't. I want my deeds. I want to give it to my children." I wanted to fix the deeds up to my kids.

Q. Okay.

**19.** Debtor has not expressly abandoned her position that the disputed note was actually executed in October or November 1983.

**20.** The court has considered the testimony of Walter Seymour, a former employee of Charlie Cox. Although Seymour's testimony partially supports Charlie Cox's version of the circumstances surrounding the execution of the May 21, 1983 note, his testimony is not conclusive in light of other evidence.

**21.** However, the court has considered debtor's assertion that the Bank violated federal Truth in Lending provisions by failing to give her notice of the disputed $26,116.27 business loan to her

husband. Credit transactions involving extensions of credit primarily for business purposes are exempted from the Truth in Lending provisions. 15 U.S.C.A. § 1603(1) (1982).

**22.** Margie Cox testified that her purported signature on the Bank's signature card for her husband's checking account (Exh. 21), showing her and Charlie Cox as authorized signatories, is not her signature.

**23.** See Exh 48, Discovery Deposition of Margie Louise Cox at 5.

**24.** Transcript of Proceedings at 90.

A.  That's how I found out.

Q.  Now, this was before your bankruptcies?

A.  Of course, yes, yes.[25]

■ Considering the proof, especially the debtor's lack of financial sophistication and Charlie Cox's unusual and, in at least one instance, bizarre, customer relationship with the Bank,[26] this court refuses to enforce the boilerplate dragnet clause in the printed form deeds of trust held by the Bank. Doing so would produce an unconscionable result. The court is persuaded that when she executed the deeds of trust to the Bank the debtor, the sole owner of the one-acre tract and adjoining 0.68–acre tract, never imagined, much less understood, that her individual property might secure business debts owing solely by her husband to the Bank. There is not a scintilla of proof that the Bank ever relied upon the dragnet clause in its dealings with Charlie Cox.[27] Hence, the Bank's claim against the debtor's property based on the $26,116.27 note is disallowed.

### III

■ The question remains whether the debtor is entitled to any recovery under Tenn.Code Ann. § 66–25–102 (1982) which provides in part:

*Penalty for failure to release.*—(a) If the holder of any debt secured by real property situated in this state shall arbitrarily or unreasonably fail to enter a proper release of record after having been fully paid or satisfied within thirty (30) days from the receipt of a written request from the party making such payment, including, but not limited to the maker, the mortgagor, the purchaser of the property covered by such instrument or any closing agent or attorney who has collected and transmitted funds for such payment, the holder of the debt shall forfeit to the party making such request the sum of one hundred dollars ($100).

(b) If the indebtedness is not released within the aforestated thirty (30) day period, the party having requested the release shall again request the release, and, if after thirty (30) days from the second request, the indebtedness has not been released, the holder shall forfeit to the party making the request a sum not to exceed one thousand dollars ($1,000).

(c) In the event suit is instituted to collect either or both of the forfeitures, the holder shall also be liable to the party instituting suit for all reasonable expenses, attorney fees, and the court costs incurred in the action.

This statute is penal, not remedial, in nature and must be strictly construed. *Kitts v. Kitts,* 136 Tenn. 314, 189 S.W. 375 (1916).

Through her attorney, on March 19, 1985, the debtor initially made written demand, as required by the statute, upon the Bank to release the May 25, 1976 deed of trust against her one-acre and adjoining 0.68–acre tracts. A second demand was made by the debtor's attorney in his letter to the Bank dated April 22, 1985.

■ The Bank contends its refusal to release the deed of trust was neither arbitrary nor unreasonable. The Bank notes that the demand was made during the pendency of this litigation. Further, the Bank reacquired a consensual lien against both tracts subsequent to satisfaction of the note secured by the May 25, 1976 deed of trust.

Though finding that the May 25, 1976 deed of trust should be released, the court does not find the Bank's failure to accede to debtor's demand was arbitrary or unrea-

---

**25.** See Exh. 48, Discovery Deposition of Margie Louise Cox at 44–45.

**26.** Cox's testimony that at one time the Bank demanded that he pay a $167,000.00 obligation arising from his bid, at the request of C.H. Butcher, at an auction sale on behalf of Blue Ridge Land and Development Company, is undisputed in this record.

**27.** This fact materially distinguishes the instant case from *Wright v. Lincoln County Bank,* 62 Tenn.App. 560, 465 S.W.2d 877 (Tenn.Ct.App. 1970), *cert. denied,* where the interest of a tenant in common, who had read the deed of trust containing a dragnet clause, was subjected to payment of an indebtedness incurred without his consent or knowledge by a cotenant.

sonable. The Bank's declination pending an adjudication of its rights was not unreasonable under the facts in this proceeding.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 7052.